**No. 11-15724-GG**

==================================================================

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

==================================================================

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

**v.**

**THEODORE STEWART FRIES,**

*Defendant-Appellant.*

―――――――――――

A Direct Appeal of a Criminal Case
From the United States District Court
for the Northern District of Florida, Tallahassee Division
District Court Case No. 4:11cr22-RH

―――――――――――

## *ANDERS* BRIEF FOR APPELLANT

―――――――――――

Randolph P. Murrell
Federal Public Defender
By: Chet Kaufman
Assistant Federal Public Defender
Florida Bar No. 814253
227 N. Bronough Street, Ste. 4200
Tallahassee, Florida 32301
Telephone: (850) 942-8818
FAX: (850) 942-8809
Attorney for Appellant

Cir. Ct. No. 11-15724-GG

United States v. Theodore Stewart Fries

<u>CERTIFICATE OF INTERESTED PERSONS</u>

The following are persons with an interest in the outcome of this case:

Coody, Jason R.: Assistant U.S. Attorney

Davies, Robert G.: Assistant U.S. Attorney

Fries, Theodore Stewart: Appellant

Hinkle, Robert L.: U.S. District Judge

Kaufman, Chet: Assistant Federal Public Defender

Marsh, Pamela C.: U.S. Attorney

Mickle, Stephan P.: U.S. District Judge

Murrell, Randolph P.: Federal Public Defender

Satterfield, Jessica: U.S. Probation Officer

Sherrill, Jr., William C.: Magistrate Judge

## STATEMENT REGARDING ORAL ARGUMENT

Undersigned counsel sees no need to hold oral argument in this case.

## TABLE OF CONTENTS AND CITATIONS

<u>Contents</u>                                                                                                                <u>Page</u>

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     (i)   <u>Nature of the Case and Statement of Non-incarceration</u>. . . . . . . . . . 3

     (ii)   <u>Course of Proceedings and Dispositions in the Court Below</u>. . . . . . . 3

     (iii)   <u>Statement of the Facts</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          1.    *Jury selection*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          2.    *Jury instruction on Count II*. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          3.    *Trial evidence regarding Count II*. . . . . . . . . . . . . . . . . . . . . . 9

          4.    *Sentencing*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     (iv)   <u>Standard of Review</u>.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT AND CITATIONS OF AUTHORITY. . . . . . . . . . . . . . . . . . . . . 19

     COUNSEL CANNOT IN GOOD FAITH ARGUE ANY ISSUE ON
     APPEAL, SO COUNSEL FILES THIS BRIEF PURSUANT TO
     ANDERS v. CALIFORNIA, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d
     493 (1967), UNITED STATES v. OSORIO-CADAVID, 955 F.2d 686
     (11th CIR. 1992), UNITED STATES v. BLACKWELL, 767 F.2d 1486
     (11th CIR. 1985), 11th CIR. R. 27-1(a)(8).. . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF CITATIONS

**Supreme Court**

*Anders v. California, 386 U.S. 738, 87 S. Ct. 1396,
     18 L. Ed. 2d 493 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17-19

**Circuit Courts of Appeals**

United States v. Blackwell, 767 F.2d 1486 (11th Cir. 1985). . . . . . . . . . . . . 2, 17-19

United States v. Nolan, 223 F.3d 1311 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . 9

United States v. Osorio-Cadavid, 955 F.2d 686 (11th Cir. 1992). . . . . . . . . 2, 17-19

**Statutes**

18 U.S.C. § 922(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 922(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

18 U.S.C. § 923(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 924(a)(1)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3665. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 C.F.R. § 478.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

iv

**Guidelines**

USSG § 2K2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

USSG § 2K2.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Rules**

11th Cir. R. 27-1(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17-19

Pattern Jury Instruction 34.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

## TABLE OF RECORD REFERENCES IN THE BRIEF

Docket #                                                                 Brief Page #

1            Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16           Motion to Dismiss.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

20           Proposed Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25           Proposed Jury Instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

26           Proposed Jury Instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

35           Discussion Draft of Jury Instructions.. . . . . . . . . . . . . . . . . . . . 8

39           Jury Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

42           Order of Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

52           Sentencing Memorandum (SEALED). . . . . . . . . . . . . . . . . . . . . 17

55           Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17

56           Statement of Reasons (SEALED).. . . . . . . . . . . . . . . . . . . . . . . 16

65           Transcript of Jury Proceedings (SEALED). . . . . . . . . . . . . . . . . 4

66           Transcript of Attorney Conference.. . . . . . . . . . . . . . . . . . . . . . 20

67           Transcript of Charge Conference. . . . . . . . . . . . . . . . . . . . . . . . 6

68           Transcript of First Day of Trial 7/26/2011. . . . . . . . . . . 6, 8-10, 19, 20

69           Transcript of Second Day of Trial 7/27/2011. . . . . . . 8, 11, 16, 19, 20

70           Transcript of Sentencing.. . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16, 17

Sealed Exh. Pre-Sentence Investigation Report. . . . . . . . . . . . . . . . . . . . . . . . . 16

## STATEMENT OF JURISDICTION

The United States District Court, Northern District of Florida, Tallahassee Division, had jurisdiction pursuant to 18 U.S.C. § 3231.  Following the jury's verdict of guilty on one count, R39, the district court orally imposed judgment and sentence on November 16, 2011, R70, and entered written judgment and sentence on November 22, 2011, R42.  Appellant filed a notice of appeal on December 5, 2011. R57.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides that the court of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States except where a direct review may be taken to the Supreme Court.

<u>STATEMENT OF THE ISSUE</u>

COUNSEL CANNOT IN GOOD FAITH ARGUE ANY ISSUE ON APPEAL, SO COUNSEL FILES THIS BRIEF PURSUANT TO <u>ANDERS v. CALIFORNIA</u>, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967), <u>UNITED STATES v. OSORIO-CADAVID</u>, 955 F.2d 686 (11th CIR. 1992), <u>UNITED STATES v. BLACKWELL</u>, 767 F.2d 1486 (11th CIR. 1985), 11th CIR. R. 27-1(a)(8).

## STATEMENT OF THE CASE

(i)    Nature of the Case and Statement of Non-incarceration

This is the direct appeal of a felony judgment and sentence of probation. Appellant is not presently incarcerated.

(ii)    Course of Proceedings and Dispositions in the Court Below

A federal grand jury charged Appellant, Theodore Stewart Fries, with (Count I) dealing firearms without a license in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D); and (Count II) knowingly selling a Kimber 45-caliber pistol to a non-state resident on or about April 24, 2012, in violation of 18 U.S.C. §§ 922(a)(5) and 924(a)(1)(D). R1P1-2. The indictment also sought forfeiture of firearms pursuant to 18 U.S.C. § 3665, id., but no forfeiture was ordered.

At the end of a jury trial, he was acquitted of Count I and found guilty of Count II. R39P1. The district court varied beneath the recommended guideline range to sentence Fries to 2 years' probation. The district court also imposed a $100 special monetary assessment. R55P1-8.

(iii)    Statement of the Facts

The bulk of the testimony dealt with Count I. Because Fries was acquitted of Count I, this brief details only facts relevant to the trial and sentencing for Count II.[1]

---

[1] See discussion infra., p.19-20.

3

### 1.    *Jury selection*

Defense counsel pretrial asked the district court to inquire in voir dire about the venire panel members' views and experiences with respect to firearms.   R20P1; R25P1.   The record does not contain a ruling on those specific requests.   However, the district court did ask the panel members to disclose whether they have or had any firearm licenses, whether they have had any experiences with firearms, whether they belong to any organizations that take a position on firearms, what their views were on the right to own firearms, and whether they would follow the firearms-related law they were to be told.   R65P17-45, 67-69, 83-85, 89-92.   The district court made no rulings on juror challenges adverse to the defense's position.   R65P92-100.

### 2.    *Jury instruction on Count II*

Before trial, Fries asked the district court to modify Pattern Jury Instruction 34.2, which addresses the offense of transfer of a firearm to a non-resident, so as to

fit the prohibition of the statute, 18 U.S.C. § 922(a)(5), to the facts of this case.  R26.[2]

Fries asked the district court to add the following language:

_____

[2] The pattern instruction says:

Under certain circumstances, it's a Federal crime for anyone who isn't a licensed dealer to sell or transfer a firearm to someone who lives in another state.

The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

    (1)    the Defendant willfully transferred, sold, or delivered a firearm to another person;

    (2)    at the time, neither the Defendant nor the person who received the firearm was a licensed firearms dealer, importer, manufacturer, or collector; and

    (3)    the Defendant knew or had reasonable cause to believe that the person who received the firearm resided in another state.

A "firearm" is any weapon designed to or readily convertible to expel a projectile by the action of an explosive. The term includes the frame or receiver of any such weapon or any firearm muffler or silencer.

To "transfer" a firearm means to deliver it to someone else.

To have "reasonable cause to believe" that someone resides in another state means to know facts that would lead a reasonable person to conclude that the other person resides in another state.

The heart of this crime is to willfully transfer a firearm to a resident of another state.

[It's not a crime to lend or rent a firearm to someone for legal sporting purposes.

It's not a crime to transfer or deliver a firearm to a nonresident when carrying out a bequest or intestate succession as long as the person who receives the firearm may do so under that person's state law.]

[A "bequest" is property given to someone else in a will.

"Intestate succession" is the method defined by state law to distribute the estate of someone who dies without a will.]

Eleventh Circuit Pattern Jury Instructions (Criminal Cases)  34.2 (2010).

> An individual resides in a state if he or she is present in the state with the intention of making a home in that state. A citizen may be a resident of more than one state if he maintains a home in more than one state. During the time the individual stays in any one of his homes, be it for a weekend or a month, he is a resident of the state where the home is located.

R26P2. He argued that the requested language, based on 27 C.F.R. § 478.11, is central to Fries' defense that he believed the agent/buyer could have been a resident of more than one state. Id. According to defense counsel,

> There is no question that Mr. Fries knew about this law. The evidence will show that he knows a lot about guns and at least has an understanding of the basic requirements of the law. But his explanation is going to be, "Well, I thought Peebo qualified for an exception; I thought he qualified for this dual residency."
>
> Now, objectively, I don't think he had it right, but I think the question here is: Did he know he was in some sense violating the law? And that's why I think it is just made up out of thin air. And that's why I think it is important for the jury to know that there is some law out there about dual residency; that this is not something that he just made up out of thin air. So that's why I've asked for that particular instruction, 34.2.
>
> . . . . [T]he question is whether he was acting, in essence, in good faith when he conducted this transaction.

R67P3-4, 7. The district court issued no ruling at that time.

The district court convened a charge conference at the end of the first day of the two-day trial with a discussion draft of the jury instructions. R68P297. Specifically as to Count II, the draft included the following language:

As you know from my discussion of count one, federal law requires a license to engage in the business of dealing in firearms. A person without a license can legally sell or transfer a firearm so long as the person is not engaged in the business of dealing in firearms. But a sale or transfer by an unlicensed person can only be made to a person who resides in the same state. Thus a Florida resident who does not have a federal license cannot legally sell or transfer a firearm to a person who does not reside in Florida. There are exceptions—for a transfer to a licensed dealer, for a firearm passing through inheritance, and for a firearm that is being loaned or rented for sporting purposes—but the exceptions are not involved in this case.

The defendant can be found guilty on count two if and only if all of the following facts have been proved beyond a reasonable doubt:

| | |
|---|---|
| First: | The defendant did not have a federal firearms license; |
| Second: | The defendant sold or transferred the firearm described in the indictment in Florida; |
| Third: | The defendant knew or had reasonable cause to believe that the person who was acquiring the firearm through the sale or transfer did not reside in Florida; and |
| Fourth: | The defendant acted willfully. |

**For purposes of the federal firearms laws, a person who lives in the United States and has a single home resides in the state where the home is located. A person who lives in the United States and has more than one home resides in the state with the home in which the person is staying at the time or, if the person is not staying in any of his homes, the home in which the person last stayed. A person is not a resident of a state the person merely visits, even if the person temporarily stays with a relative in that state.**

A sale or transfer is made to the person who is actually acquiring the firearm through the sale or transfer, even if another person pretends to be acquiring the firearm in order to evade federal law.

I defined willfully while discussing count one. The same definition applies to count two.

R35P8-9 (emphasis supplied).  Fries' counsel had no objection to that proposed instruction, R68P298-300, and it was actually read to the jury at the close of the evidence without objection, R38-3P8-9; R69P585-86, 591.

Defense counsel asked for an additional instruction saying that "an individual cannot sell a rifle to somebody from out of state."  R68P298.  That request was in direct response to the testimony of ATF Agent Visnofske, who, both parties agreed, erroneously testified that "'the citizen could sell a rifle to a noncitizen.'"  Id.  Defense counsel said the instruction would support the defense's view that it is reasonable to believe that Fries did not know the law if "[w]e have an ATF agent that doesn't know the law."  Id.

The district court responded, "I think the way I described it in the instructions tells them that you can't sell a firearm to an out-of-state person," and defense counsel agreed. R68P299.  The district court said it would not add anything to the instruction, but told defense counsel he would be free to argue "that [ATF Special Agent] William Lee] Visnovske got that wrong.  But, look, I mean, I understand the thrust is even an agent can be wrong about something .... And I suppose the response is, before Mr. Visnovske sold one, he'd probably made sure that he was complying with the law. So it doesn't prove very much, but if you want to argue it, you can do it."  Id.

3.    *Trial evidence regarding Count II*[3]

ATF Special Agent Donald Williams and William Lee Visnovske met at the Tallahassee Gun and Knife Show on or about December 12, 2009, where Williams asked Visnovske to purchase, undercover, handguns from Fries.   R68P162-66. Visnovske expressed to Fries an interest in a firearm "known as a CZ – Charlie Zero." R68P168.   After purchasing the handgun at a negotiated price and putting it in his waistband, Visnofske, asked to produce a Florida driver's license, identified himself as a "Georgia Boy."   R68P172.   Visnofske, posing as "Peebo," also told Fries his little brother was attending college at University of Florida, and he visited his brother once a month, coming from the family's farm in Georgia, where he said he lived. R68P186-90, 243-44, 250.   Fries told Visnofske "[t]hat he couldn't sell to an out-of-state resident; that I needed to be from Florida."   R68P176.   Agent Williams was by Visnovske's side and volunteered "that he was a Florida resident."   R68P177. Fries said he would sell the gun to Williams, and "'[n]ow what you do with it, I don't care[.]'"   R68P177.   Later on, Visnofske pretended to be interested in another weapon, a Smith & Wesson J-frame.  Fries told him he could not sell it to Visnofske,

---

[3] Undersigned counsel intended this recitation of the facts to comport with the rule that in considering the sufficiency of the evidence, this Court views the evidence in the light most favorable to the Government, with all inferences and credibility choices made in the Government's favor.  E.g., United States v. Nolan, 223 F.3d 1311, 1314 (11th Cir. 2000).

9

but suggested that if Visnofske wanted to buy it some other time and brought another person from Florida with him, that could "facilitate the transaction."  R68P182-83.

Visnofske and Williams went back to Fries at the gun show the following day, December 13.  Visnofske and Fries discussed Visnofske's hunting.  Visnofske again showed interest in the Smith & Wesson, but Fries resisted selling to an out-of-state resident just as he resisted the day before.  R68P192-96.  Visnofske, with Williams, then brought another gun into the conversation, a SIG, and negotiated a price for both weapons together.  Visnofske put $1,000 on the table, but Fries, referring to Williams, said "'He's got to pay me.'"  R68P198-99.  Fries offered the caveat that "'[h]e's buying them, and you're just loaning him the money, ain't you?'"  R68P199.

Visnofske continued to pursue Fries, phoning him in Ocala on March 19, 2010, to arrange yet another undercover buy.  R68P209-13.  They eventually hooked up at another gun show in Tallahassee on April 24, 2010.  Visnofske, again with Williams, showed interest in a Kimber handgun.  Fries said he had just received the gun in a trade but was willing to sell it for $1200.  Visnofske agreed to buy the gun and counted out the cash in front of Fries.  Fries did not ask either Visnofske or Williams for identification.  R68P214-21, 245-47.

Fries testified on his own behalf, confirming in large part Visnofske's version of what happened.  He recognized that in making sale to Visnofske and Williams

10

together, there was a "good chance" the gun would end up in Visnofske's hands.

R69P479-81.

> Q.    Did you think, though, by going through this formality that you were somehow in compliance with the law?
> A.    I felt at that point in time that I was complying with the law by selling it to a Florida resident.

R69P480. He said he did not ask for identification or go through any formalities with

them in April when he sold the Kimber because he already thought he knew

Visnofske and Williams.  R69P482.

> Q.    And what was your impression about where Peebo lived and where his brother lived?
> A.     I was told that he lived just over the line in Georgia; that he was taking care of the family farm because his father wasn't doing well.  I assumed neither parent probably were, they were older.  He was managing the farm.  And the reason -- he was a U.S. Marine Corps veteran from Iraq.  The reason he was doing this was so that his younger brother could get a college education, who he was in like his second or third year, or something, at the University of Florida.  And that he visited his brother in Gainesville, initially, he told me about once a month, but some of these calls were on Tuesdays and stuff so, you know, I don't know what he was thinking.
> Q.    But did you have the impression that he regularly visited with his brother?
> A.     Yes, and from the number of calls and -- every time they called, they were either on their way or they were going to be -- I don't think they ever called when they were actually there, but they were going to be there, or he'd call and leave a message, "We're going to be here. Can you meet us?" You know, this kind of stuff.
> Q.    So you had the impression, again, that he had a brother in Gainesville?
> A.     Yes, brother Joe.

11

Q.      And that he regularly visited Joe there in Gainesville?

A.       Yes.

Q.      Did you come to think that Joe lived in a dormitory?

A.       No.

Q.      Where did you come to think that Joe lived?

A.      The best evidence we have, it has to be that 18-minute conversation, because none of these other ones amounted to anything. And I had a really interesting and enjoyable discussion with Visnovske, and mostly about hunting. He hunted hogs. He's a very knowledgeable guy, by the way. I was really impressed. He knows cartridges; he's a reloader; and he's a Marine veteran. That's a big thing to me, okay? And he was a good guy, just a solid guy.

Q.      Did he say something that led you to believe --

A.      Well, I think I brought it up, you know. I mean, I think I -- I put kids through college. You can't stay with them in dorms. You've got to be doing something else. They don't allow visitors to stay in dorms. So purely innocent on my part, too, this is nothing -- I still didn't suspect anything. These guys had me right where they wanted me. And I just asked him, "Where do you stay when you're in --" he wanted me -- he always wanted to come down to Ocala, and I thought, "What if I meet you in Gainesville and have a coffee?" 'Cause I'm thinking just -- actually, I guess I'm a little flattered that he's asking me my opinion about guns and things, you know, it made me feel good.

        And so I said, "Where do you actually stay with your brother? Maybe we can meet in Gainesville and do something." He said -- the word I recall -- "We have a family place – 'apartment, condo, townhouse, or something' -- and we stay there, we stay there in Gainesville when I'm in Gainesville."

Q.      So that's your memory of what he told you?

A.      That's my memory of what he told me.

Q.      Tell me this: When your children went to school, did you buy property where they went to school?

A.      I didn't, but friends did. And my daughter, when she went to dental school in New York, she rented part of an apartment from a girl whose parents had bought it for her just for college. It's a very common thing.

12

Q.    So you had the impression, at least, that Joe did not live in the dormitory?

A.    Right.

Q.    And is it safe to say that somehow or another you had it in your head that Joe lived in some property owned by the family?

A.    Yes.

Q.    Now, are you absolutely certain about that?

A.    I'm absolutely certain that he gave me the impression -- he stated something the family owned.  I can't tell you whether it was -- I just don't recall.

Q.    That's the impression you had?

A.    Yes.

Q.    Okay.  Now, because of that, did you think you could sell the firearm directly to Peebo without having to go through this formality of saying, "I'm selling this gun to somebody else"?

A.    Yes, I did.

Q.    And why was that?

A.    Well, I'm familiar with -- no one is familiar with the ATF website.  It's the hardest thing in the world to try to find stuff, but I've looked around it over the years.  Those books are outdated by the time they hand them to you, but the website is pretty current, I think.  So I typically look at things on there.  Well, the '68 Act is 40-something years old.

Q.    Okay.  Let me stop there for just a second.

      I printed out something marked as Defendant's Exhibit 10.  I want to show it to you.

A.    Okay.

Q.    Does this -- of course, this is what I got off of the website in July of 2011.  Leaf through that.  Just leaf through that.  Is that essentially what you think you saw?

A.    Yes.

Q.    At any rate, based on that, what you read and what you knew, what did you seem to think -- why did you seem to think that you could sell that gun to Agent Visnovske?

A.    Well, the out-of-state rule is not hard-and-fast.  There are several exceptions to it, common-sense exceptions to it.

Q.    Let's talk about what your understanding of it is, okay?

13

A.    Which one do you want me to look at?

Q.    Well, I don't really need you to look at that in particular.  I just want to identify that as what you relied on.

A.    Oh, okay.  It's on the website, and there's a question that says, "May a person who is not an alien who resides in one state and owns property in another state purchase a handgun in either state?"

Q.    So that was something you read.  Did you have that with you on the day that you sold Mr. Visnovske the firearm?

A.    No.

Q.    Is that something that you had studied in preparation of selling a firearm to Agent Visnovske that particular day?

A.    Not really.  Actually, at the time he told it to me, I didn't think a whole lot about it, but the more I got to thinking, you know, this guy can buy a gun in Florida; I don't know what the big deal is here.

Q.    So you thought he might qualify for what some people refer to as dual residency?

A.    Yes.

Q.    Now, again, the judge is going to tell the jury exactly what it means.  But you tell us, what do you think -- how do you think he qualified for this dual residency?

A.    Well, we can't let them read the dual residency?

Q.    Well, the judge will tell them all about it.

A.    Okay.

Q.    He will instruct them on the law, and they'll get to see that exhibit.  But what I'm asking you about, your reasoning, why is it that you thought that he qualified for dual residency?

A.    Okay.  The dual residency, it's my belief and my interpretation, when I read it, that it's there to accommodate folks -- and Florida is a really common state for this -- that may live in Ohio, they may live in Georgia, they have a place in Florida, for whatever reason, and it says, if they own it, and they stay there for periods of time, they are allowed to buy a firearm in Florida.

Q.    In your view, at least for the weekends that Peebo was with his brother, was he essentially living there in Florida?

A.    That's what he told me.  I had to believe it.

14

Q.    Now, some might characterize it, visiting is different from living, but it was your view that these visits qualified as somewhat living there in Florida for at least the weekend?

A.    I worked for a man in Chicago.  He owned a place down in Fort Myers.  He would fly down for weekends.  He never spent a long period of time there, so -- the regulation says a certain period of time, but it doesn't say a day or a year or a month.  He stayed weekends.  He said he stayed there a weekend once a month.  That's fairly a certain period of time to me.

      The other aspect was, who owned it? Well, you know, maybe I stretched on that one.  I don't know if he owns it, or his dad owns, or his mother owns it, but it's a family residence, and I'm just inferring, well, this thing probably fits a family of adults.

Q.    We've talked about it.  Am I correct in saying that -- well, let me ask you:

      Is it your view that maybe you were wrong about that, as you sit here today?

A.    As I sit here today, I would like someone to tell me where I'm wrong.

Q.    Okay.

A.    That's the neat thing about firearm laws.  No one in the world seems to understand them.

Q.    By the way, in asking you about your understanding of the law, we had some discussion about this.  You thought that, as someone who did not own a firearms license, you could sell a rifle to a noncitizen?

A.    I think that's the common belief, frankly, at gun shows.  I mean, I wasn't surprised the agents thought that.

Q.    So that is sort of a belief that is common among people in gun shows?

A.    Well, I think it comes from the fact that, since dealers can do it, why wouldn't a private be able to do it? That's where it comes from.  Once again, you know, I'm finding out here now that may not be legal.

Q.    So really the ultimate question is: When you sold that gun to Agent Visnovske on April 24th, did you think that you were doing something illegal?

A.    No.

> Q.    I gather, here again, you wanted to accommodate him; you wanted to sell him a gun; you liked him?
> A.    You know, I believed him.  You know, this guy is a Marine veteran.  There is something those guys don't do.  He wouldn't lie to a Marine's father, I don't think.
> Q.    Did you think that what you were doing was legal?
> A.    I thought it was legal, perfectly legal.

R69P485-93.  See also R69P515-17.

### 4.    Sentencing

The probation officer scored the base offense at level 12 pursuant to USSG § 2K2.1.  R51, PSR ¶ 27.  With no criminal history, the recommended guidelines range fell under criminal history category I as 10-16 months' imprisonment.  R51, PSR ¶ 67.  The probation officer initially had added a 6-level specific offense characteristic for multiple firearms, but upon defense counsel's objections, those 6 levels were removed.  PSR ¶¶ 85-86.  The Government did not dispute the probation officer's decision to delete the 6-level adjustment, but contended that a 2-level adjustment was nonetheless appropriate under USSG § 2K2.1(b)(1) because 3 firearms were present at the commission of Count II.  R70P45.  Fries' counsel agreed with the Government's position.  R70P5.  That left the district court with an advisory guidelines range of 15-21 months' imprisonment.  R70P; R56P1-2 (Statement of Reasons filed under seal).

After reviewing substantial mitigating evidence and argument, R52P, R70P5-25, the district court varied beneath the guidelines and imposed a sentence of 2 years' probation and imposing a $100 special monetary assessment, giving copious reasons on the record for its decision, R70P25-44.   The district court tailored special conditions of probation.  R55P5; R70P38-44.

Neither party objected to the sentence imposed.  R70P44.

(iv)    <u>Standard of Review</u>

No standard of review is applicable since counsel files this brief pursuant to <u>Anders v. California</u>, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967), <u>United States v. Osorio-Cadavid</u>, 955 F.2d 686 (11th Cir. 1992), <u>United States v. Blackwell</u>, 767 F.2d 1486 (11th Cir. 1985), and 11th Cir. R. 27-1(a)(8).

17

## SUMMARY OF THE ARGUMENT

Counsel files this brief pursuant to <u>Anders v. California</u>, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967), <u>United States v. Osorio-Cadavid</u>, 955 F.2d 686 (11th Cir. 1992), <u>United States v. Blackwell</u>, 767 F.2d 1486 (11th Cir. 1985), and 11th Cir. R. 27-1(a)(8).

<u>ARGUMENT AND CITATIONS OF AUTHORITY</u>

COUNSEL CANNOT IN GOOD FAITH ARGUE ANY ISSUE ON
APPEAL, SO COUNSEL FILES THIS BRIEF PURSUANT TO
<u>ANDERS v. CALIFORNIA</u>, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d
493 (1967), <u>UNITED STATES v. OSORIO-CADAVID</u>, 955 F.2d 686
(11th CIR. 1992), <u>UNITED STATES v. BLACKWELL</u>, 767 F.2d 1486
(11th  CIR. 1985), 11th CIR. R. 27-1(a)(8).

<u>United States v. Blackwell</u>, 767 F.2d 1486, 1487-88 (11th Cir. 1985), requires

counsel to "set out *any* irregularities in the trial process or other potential error which,

although in his judgment not a basis for appellate relief, might, in the judgment of his

client or another counselor or the court, be arguably meritorious."  Undersigned

counsel has reviewed the file and transcripts and cannot in good faith raise any

arguments for reversible error.

Undersigned counsel sees no basis on this record to argue that any possible

errors involving the acquitted count bled over to affect the judgment on Count II.  For

example, Fries asked for the jury to be instructed as to the definition of "livelihood,"

to modify its instruction on Fries' claim that he was engaged in a hobby, and to alter

the instruction as to the defense of good faith reliance on legal advice.  The district

court denied those objections.  R69P316-24.  However, each of those denied requests

affected the instructions for Count I only.  <u>See also</u> R68R42-44, 76-80, 85-86, 144,

160 (overruling defense counsel objections regarding investigation of unlicensed

firearms dealing).  And the acquittal on Count I mooted the denial of Fries' motion to dismiss Count I.  R16; R66P5; R69P530-31; R42.

This Court may nonetheless wish to consider whether the district court committed reversible error by declining to instruct the jury that "an individual cannot sell a rifle to somebody from out of state."  R68P298.  See supra p.8.

20

<u>CONCLUSION</u>

Counsel files with this brief a motion to withdraw, asking this Court to permit

counsel to withdraw and to permit Appellant to file a brief on Appellant's own behalf

if Appellant wishes.

Respectfully submitted,
Randolph P. Murrell
Federal Public Defender

By:    *s/Chet Kaufman*
Chet Kaufman
Asst. Federal Public Defender
Florida Bar No. 814253
227 N. Bronough Street, Ste. 4200
Tallahassee, Florida 32301
Telephone: (850) 942-8818
FAX: (850) 942-8809
Attorney for Appellant

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been furnished electronically in Acrobat format by Internet upload to this Court and by U.S. Mail to Assistant United States Attorney Jason R. Coody, 111 N. Adams Street, 4th Floor, Tallahassee, FL 32301, and to Theodore Stewart Fries, 5465 N.E. First Lane, Ocala, FL 34470, on this 9th day of April, 2012.


 s/Chet Kaufman
CHET KAUFMAN
Assistant Federal Public Defender

22